DECISION AND JOURNAL ENTRY
This cause was heard upon the record in the trial court. Each error assigned has been reviewed and the following disposition is made:
Appellant Roger Schoonover (Father) and Appellant Laura Moore (Mother) have appealed separately from a judgment of the Summit County Court of Common Pleas, Juvenile Division, that granted permanent custody of their child, Rebecca Moore, to the Summit County Children Services Board (CSB). The appeals are consolidated for purposes of this opinion. This court affirms the judgment of the juvenile court as to both Appellants.
 I.
Roger Schoonover and Laura Moore are the parents of Rebecca Moore, born November 7, 1997, and Patricia Moore, born May 19, 1999. Patricia was born with a cleft palate and cleft lip. CSB became involved with the family shortly after Patricia's birth because of concerns regarding the special needs of that child. On September 13, 2000, both parents voluntarily surrendered their parental rights to Patricia because they believed they could not address her physical problems.
During the course of those proceedings, on September 30, 1999, CSB filed an affidavit, which alleged that Rebecca was a dependent and neglected child and requested emergency temporary custody. In the complaint CSB alleged that such custody was necessary for three reasons. First, they alleged that Rebecca lacked adequate parental care because of the faults or habits and/or mental or physical condition of the parents. The mother and father both failed to complete a substance abuse evaluation, leave weekly urine screens, and follow through with involvement at Portage Path Behavioral Health Center. Second, Rebecca was developmentally delayed. At nearly twenty-three months, she could not walk or talk and was physically small. Third, the parents were unable to provide appropriate care for Rebecca. They were alleged to live a transient lifestyle and were recently evicted from their home for failure to pay rent. The parents were also alleged to not adequately account for the use of government funds they received. The juvenile court granted emergency temporary custody to CSB and scheduled a shelter care hearing before a magistrate. After the shelter care hearing on October 1, 1999, the magistrate ordered that Rebecca remain in the emergency temporary custody of CSB, appointed a guardian ad litem for the child[1], and appointed legal counsel for the parents.
On December 13, 1999, Rebecca was adjudicated dependent and the allegation of neglect was dismissed. The parties proceeded to a dispositional hearing, at the conclusion of which the magistrate committed Rebecca to the temporary custody of CSB. Periodic review hearings were held, and eventually a motion for permanent custody was filed by CSB on December 18, 2000. A hearing was had before a judge of the juvenile court and permanent custody was awarded to CSB.
Appellants separately appealed. This court consolidates the appeals for purposes of this opinion. Several of the assigned errors are similar and will be addressed together, with attention to the separate positions of the parties where necessary. Some errors will be consolidated to facilitate discussion.
 II. A.
Both Appellants challenge the finding of the juvenile court that it was in the best interest of the child to award permanent custody to CSB and argue that the judgment was against the weight of the evidence. Both Appellants additionally contend that CSB failed to use reasonable efforts to reunite the family, and that the parents substantially complied with the case plan. Because these claims involve issues that are related, they will be considered together.
When evaluating whether a judgment is against the manifest weight of the evidence in a juvenile court, the standard of review is the same as that in the criminal context. In re Ozman (Apr. 14, 1999), Summit App. No. 18983, unreported, at 3. In determining whether a criminal conviction is against the manifest weight of the evidence:
 The court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the [trier of fact] clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and new trial ordered. The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction.
State v. Thompkins (1997), 78 Ohio St.3d 380, 387, quoting State v.Martin (1983), 20 Ohio App.3d 172, 175. Moreover, "[e]very reasonable presumption must be made in favor of the judgment and the findings of fact [of the trial court]." Karches v. Cincinnati (1988), 38 Ohio St.3d 12,19. Furthermore, "if the evidence is susceptible of more than one construction, we must give it that interpretation which is consistent with the verdict and judgment, most favorable to sustaining the [juvenile] court's verdict and judgment." Id. Accordingly, before an appellate court will reverse a judgment as against the manifest weight of the evidence in this context, the court must determine whether the trier of fact, in resolving evidentiary conflicts and making credibility determinations, clearly lost its way and created a manifest miscarriage of justice.
Pursuant to R.C. 2151.414(B), the juvenile court may grant permanent custody to CSB upon two separate findings, each established by clear and convincing evidence. Clear and convincing evidence is that which will produce in the trier of fact "`a firm belief or conviction as to the facts sought to be established.'" In re Adoption of Holcomb (1985),18 Ohio St.3d 361, 368, quoting Cross v. Ledford (1954), 161 Ohio St. 469, paragraph three of the syllabus.
First, the court must find that it is in the best interest of the child to grant permanent custody of the child to the agency that filed the motion. A determination of best interest is governed by R.C. 2151.414, which provides that the court must consider all relevant factors, including:
 (1) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child;
 (2) The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;
 (3) The custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two month period ending on or after March 18, 1999;
 (4) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency[.]
Evidence presented at the permanent custody hearing established that the child had been in the custody of CSB for eighteen months as of that time and had been making good progress in many areas while she had been in her foster home. The wishes of the child, as expressed through the guardian ad litem, are that she should be placed in the permanent custody of CSB. The caseworker affirmed that the child needs a legally secure and permanent placement and that such a placement cannot be achieved without a grant of permanent custody to the agency. Further evidence in support of the best interest finding is addressed more fully below.
Second, the court must determine that one of the factors in R.C.2151.414(B)(1) apply. The court below found that the child had been in the temporary custody of an appropriate agency for twelve or more months out of a twenty-two month period as defined in the statute. R.C.2151.414(B)(1)(d). Mother and Father concede this point. In addition, the juvenile court also found that the child cannot be placed with either of the child's parents within a reasonable time or should not be placed with the child's parents. R.C. 2151.414(B)(1)(a). In making this determination, the court is required to consider all relevant evidence. R.C. 2151.414(B). If a juvenile court determines, by clear and convincing evidence, that one or more of the factors in R.C. 2151.414(E) exist as to each of the child's parents, then the court must find that the child cannot be placed with either parent within a reasonable time or should not be placed with either parent. In re Thorn (Feb. 16, 2000), Summit App. No. 19597, unreported, at 8. The relevant statutory factors include:
 (1) Following placement of the child outside the child's home and notwithstanding reasonable case planning and diligent efforts by the agency to assist the parents to remedy the problems that initially caused the child to be placed outside the home, the parent has failed continuously and repeatedly to substantially remedy the conditions causing the child to be placed outside the child's home. In determining whether the parents have substantially remedied those conditions, the court shall consider parental utilization of medical, psychiatric, psychological, and other social and rehabilitative services and material resources that were made available to the parents for purpose of changing parental conduct to allow them to resume and maintain parental duties.
 (2) Chronic mental illness, chronic emotional illness, mental retardation, physical disability, or chemical dependency of the parent that is so severe that it makes the parent unable to provide an adequate permanent home for the child at the present time and, as anticipated, within one year after the court holds the hearing * * *;
* * *
(16) Any other factor the court considers relevant.
The juvenile court entered a finding that the child cannot and should not be placed with either parent within a reasonable time. It reasoned that, notwithstanding reasonable case planning and diligent efforts by CSB to assist the parents in remedying the problems that initially caused the child to be placed outside the home, both parents have repeatedly failed to remedy the situations and conditions that caused the original removal of the child. See R.C. 2151.414(E)(2).
At the time of the original removal of the child, at the age of nearly two, she could not walk or talk and the family had been evicted from their home. They did not want to go to a shelter and so were staying with a friend. That home was inappropriate as it was dirty, overcrowded and contained rotting food.
A case plan was already in effect before CSB sought temporary custody of Rebecca because of the agency's involvement with the family in regard to Patricia. The case plan was amended to include additional matters relating to the care of Rebecca. The objectives and concerns of the case plan included: (1) maintaining clean, safe housing and providing for Rebecca's basic needs, (2) meeting Rebecca's medical needs, (3) addressing parents' substance abuse, (4) addressing Ms. Moore's intellectual impairment, (5) addressing Mr. Schoonover's mental health, and (6) demonstrating appropriate parenting skills and learning parenting techniques that will stimulate children and help them develop.
Appellants' claims that they have substantially complied with the case plan are not supported by the record. While the parents have established safe housing, the other objectives have not been met.
Regarding parents' substance abuse, the record establishes that Mother tested positive for marijuana at the birth of both children and each child also tested positive for the drug at that time. Mother participated in a drug program, but relapsed into marijuana use after completion of the program. She participated in counseling with two different counselors, but was terminated in each after many failed appointments. Mother says she would do anything for Rebecca, but quit the drug program because it was too much trouble. Father completed an assessment at Oriana House, but failed to obtain counseling. He stated that he does not see marijuana as a problem, though he knows it is illegal. He did understand that in order to get Rebecca back he needed to submit urine samples, yet he did not comply because it was too far to go. He also stated that he understood he needed to stop using drugs, yet admits he did not do so. Then, again, on other occasions, he denied using drugs — even in light of positive test results. Neither parent has come remotely close to compliance with the request to submit weekly urine samples. Submissions were very sporadic and frequently indicated positive for marijuana.
Mother's intellectual impairment and emotional health was addressed by an assessment at Portage Path that revealed depression issues. CSB asked her to have a psychiatric evaluation and she made appointments, but did not keep them. Weekly counseling sessions were then set up at the Community Health Center until she was discharged because she did not keep the appointments. Intelligence tests revealed that she was not entitled to any additional services.
Father self-reports that he was diagnosed with schizophrenia as a teenager, for which he now receives public assistance. He states that he took medication for his condition at one time, but does not do so currently. He claims that the medication affected him in a negative way and he does not want to take it. He was referred for a psychological assessment at Portage Path, where he first denied having any hallucinations, but later admitted having hallucinations of 15 to 30 minutes duration. Father was given the names of several psychiatrists and began seeing one of them. He quit after three sessions, stating that the doctor is foreign and difficult to understand and, in any event, Father believes he can control "the voices" when he is not on medication. Father did not tell the doctor or anyone else about his problems with the medication, nor did he attempt to see another doctor. He claims that his psychotic issues are "under control," but no medical evidence confirms this.
Each parent attended three parenting programs and completed two. The caseworker testified that she has seen the parents implement some positive things from their classes, but the efforts are not consistent and the parents have not made much progress with discipline or in setting limits. The guardian ad litem reports similarly that, although they have completed parenting classes and seem to understand the concepts, they do not always know how to apply them. The parents have missed only one visit with their daughter. They have, however, made little progress in learning to communicate with her. Mother knows only three hand signs and Father knows none. Mother participated with the speech therapist in Rebecca's lessons and Father did so occasionally. Mother tried to play with Rebecca and read to her, but she has a very short attention span and the caseworker questions whether she will be able to provide the direction, structure, and consistency in her discipline and motivation that Rebecca requires. Father preferred roughhousing and active play during his visits.
Father complains that the case plan was not explained to him and he did not understand that his parenting was being critically observed during visitations. This argument carries little weight. He cannot be heard to deny responsibility for his own actions. Mother has testified that the case plan was explained and both parents signed the case plan indicating that it was explained to them. Furthermore, at the time CSB initially became involved, Father stated that he felt Rebecca was not delayed and did not need any special services, but was progressing at her own rate. According to the caseworker, Father "shut down" when they began to attempt to plan for Rebecca's developmental delay and did not become involved.
Additional evidence was presented through testimony from a developmental pediatrician, a speech therapist, two Community health Center counselors, Rebecca's special education pre-school teacher, the child's foster mother, CSB's caseworker, a friend of Father, the maternal grandmother, and each parent. Numerous exhibits were also admitted into evidence.
This evidence established that at the time Rebecca was first taken into the temporary custody of CSB, she could not walk and was only able to crawl a few feet, had little energy, and would lay on the floor doing nothing but watch television and whine. She had no muscle tone and her hair was thin, sparse, and falling out. She was markedly delayed in her speech — two years in expression and six months to one year in comprehension. In addition, she was delayed in her eating ability, as she would hoard food in her mouth. Though very small, her height and weight were proportional. Rebecca's hygiene was very poor and her clothes were not clean. She had "global delays" in gross and fine motor skills, language and speech. Following referrals to professionals in the areas of endocrinology, orthopedics, genetics and neurology, no specific diagnosis was able to be made as to the reason why the child was developmentally delayed.
The developmental pediatrician testified that since Rebecca has been in foster care, she has made very good developmental gains. Rebecca is doing much better with gross motor skills. She has begun walking, climbing steps, and has had other interactional and developmental areas of improvement. Her receptive language has improved greatly, though her expressive language is still very limited. She has been taught to eat and now eats well. Rebecca is attending an integrated pre-school weekday mornings and is on a waiting list for additional speech therapy at Children's Hospital. According to this expert, Rebecca requires a very stimulating, structured, and consistent environment, and a caretaker with the ability to follow through with not only typical educational needs, but also special educational and rehabilitative services and intense speech therapy needs. Furthermore, even with services, Rebecca will likely continue to have special needs throughout her lifetime.
The caseworker described Rebecca as being still small for her age, but is clean and wears clean clothes. She smiles and gives hugs and kisses. Her hair is full and shiny. She relates to people, interacts more than before, and is very social with other children. She no longer hoards food in her mouth.
The speech therapist presented lessons to Rebecca during the parents' visitation sessions in order that the parents could be involved and practice helping with her speech lessons. She also introduced some simple sign language to Rebecca to help her communicate. She testified that it is crucial that Rebecca's caregivers work with her on communication daily.
Rebecca's pre-school teacher stated that Rebecca will not interact unless such interaction is facilitated by her caregiver, otherwise she just sits with a doll. She requires a firm approach and home caregivers are crucial to her development. The teacher stated that Rebecca has made progress in learning to put on her own coat, get her papers from her cubby, put them in her bookbag, and use the bathroom.
Rebecca's foster mother testified regarding her care of Rebecca. This foster mother has extended care to over fifty foster children, all with some sort of disability. Rebecca's daily schedule includes arising at 6:45a.m., helping to dress herself, eating breakfast, getting on the school bus and attending school weekday mornings. After lunch and a nap, the foster mother then participates in speech therapy, occupational therapy and movement activities with Rebecca. Rebecca can now walk, run, play, climb stairs, and color. Her spoken vocabulary has increased. She has tone to her muscles, a little pot-belly, and looks healthy. She eats vegetables, fruits, meats, chips, pretzels, cookies and eats three meals a day. The foster mother explained that she has three other needy children, but that Rebecca is the most difficult and most time-consuming. She must encourage her every step along the way. Rebecca is now able to play for seven to ten minutes at a time. The foster mother testified that Rebecca has a bond with her parents and is excited to see them. Afterwards, however, she is non-communicative and whiny for a couple days.
Delores Moore, maternal grandmother, and Steve Hracy, friend of Mr. Schoonover, each testified that they saw Appellants interact with Rebecca, read to her, feed her, bathe her, take her places including the library, and tried to get her to walk. They saw Rebecca eat scrambled eggs, cereal and oatmeal, French fries, and little pieces of hamburger. Delores Moore was not aware that the parents ever used marijuana. She stated that the parents expressed concern for Rebecca's delays at about one year, but does not know that they sought any help. Mr. Hracy has permitted the parents to babysit for his own child.
CSB expressed concerns with the ability of Mother and Father to manage their finances, including government funds. The record supports such concerns. In September of 1999 the family was evicted from their home for failure to pay rent. Parents claimed the problem was that they had not received a public assistance check. Upon inquiry, the caseworker determined that the check had been cashed. Father has a disability payee who receives his disability check on his behalf and is responsible for paying their rent and buying their food. Father testified that the reason he has a payee for his disability check is that "I have been told * * * [by Social Security] that I can't manage my money." Father recently changed his disability payee from Mr. Hracy to someone whose last name he is unsure of. He did not tell Mr. Hracy that he was making the change and is not sure why he did not do so. In addition, both Father and Mother have tenuous employment situations. Father recently lost his part-time job at a gas station and Mother sells Avon products and does occasional babysitting. Mother has had no success in obtaining a job outside the home, despite a stated goal of getting a good paying job. She claims that the lack of a telephone has hindered her efforts.
The guardian ad litem reported that the parents understood parenting concepts, but did not always know how to apply them. She believes that Rebecca's problems are only beginning to be seen. She needs much specialized help and much therapy. She needs consistency and stability. The parents have a great deal of instability and that would disconnect Rebecca from the services she needs. She is concerned that Mother may not be able to carry through with techniques. She believes that it is in the best interest of Rebecca that CSB have permanent custody of her.
The juvenile court concluded that the parents were unable or unwilling to provide care for Rebecca because of, inter alia, their failure to meaningfully address their drug use and/or abuse; inabilities to consistently apply the parenting skills that they have learned from parenting courses in their interactions with Rebecca, inabilities to appreciate Rebecca's severe developmental delays; parents' borderline intellectual functioning; parents' poor hygiene; and parents' lack of insights, truthfulness, and sincerity. The court also found that CSB made reasonable efforts to encourage and involve the parents in reunification efforts and that the parents have failed to substantially comply with the case plan objectives. Further, the court summarized, that these parents "cannot provide the stimulating, structured, and consistent environment nor facilitate the educational and rehabilitative services this Child so desperately needs." The court specifically found the following: (1) that it was in the best interest of the child to be placed in the permanent custody of CSB, (2) that the child cannot and should not be placed with either parent within a reasonable time, (3) that the parents have repeatedly failed to remedy the situations and conditions that caused the original removal of the child, (4) that the child had been in the temporary custody of CSB for twelve of the last twenty-two consecutive months prior to the filing of the motion for permanent custody, (5) and that the child needs and deserves a legally secure placement.
Upon review, this court finds that the juvenile court did not err in finding that it was in the best interest of the child to be placed in the permanent custody of CSB and that the child cannot be placed with either parent within are reasonable time or should not be placed with either parent. Nor did the juvenile court err in finding that CSB has made reasonable efforts to reunite the family and that the parents have failed to comply with the case plan established by CSB. Furthermore, the weight of the evidence supports these findings. Father's first, second and third assignments of error are overruled. Mother's first through fifth assignments of error are overruled.
 B.
Next, Appellants both contend that the juvenile court erred in denying their motion in limine, seeking to prohibit evidence regarding observations by agents of CSB as to their ability to feed their newborn child Patricia.
A ruling on a motion in limine is a preliminary ruling as to the potential admissibility of evidence at trial and cannot serve as the basis for error on appeal. Pena v. Northeast Ohio Emergency Affiliates, Inc. (1995), 108 Ohio App.3d 96, 108. An objection to such evidence must be raised once the issue is presented during the trial in order to properly preserve the question for appeal. State v. Maurer (1984), 15 Ohio St.3d 239,259-60. Appellants have not indicated that such evidence was admitted during the hearing. Further, if such evidence was admitted, Appellants are obligated to indicate the page references in the transcript where such objection took place. App.R. 12(A)(2). They have not done so. Accordingly, this argument is overruled.
 C.
Finally, we are compelled to address two statements within the judgment order of the juvenile court which are not supported by the record. First, the juvenile court made a singular reference to cocaine use by Mother at the time of the birth of Patricia. In light of the frequent mention of marijuana throughout the judgment order and lack of any suggestion in the entire record of the use of cocaine, we conclude that this reference is no more than an inadvertent mistake.
Second, the juvenile court stated that the developmental pediatrician attributed the child's dysmorphic facial features to prenatal drug use by the parents. This statement is an error. The pediatrician, in fact, stated that she could not attribute the child's facial features to any such cause. Nevertheless, an erroneous factual finding is of no moment where the fact erroneously found does not contribute in any way to the result reached by the court. The court below presented a detailed explanation of its reasons for concluding the case as it did. All of those reasons related to the present care of this child.
In light of the extensive and cogent explanation of present deficiencies, we are not inclined to fault the court for misstating two historical facets of the case. Indeed, in sixteen pages of single-spaced findings, it would be unusual not to find at least some inaccuracies.
 III.
All assignments of error raised by Appellant Schoonover and Appellant Moore are overruled. The judgment of the juvenile court is affirmed.
The Court finds that there were reasonable grounds for these appeals.
We order that a special mandate issue out of this Court, directing the County of Summit, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.
Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(E).
Costs taxed to Appellant.
Exceptions.
SLABY, J., CARR, J. CONCUR.
[1] The person appointed to represent Rebecca as guardian ad litem also served as Patricia's guardian ad litem.